```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


MARGARET O'CONNOR o/b/o          )
DANIEL O'CONNOR,                 )
                                 )
          Plaintiff,             )
                                 )
     v.                          )    No. 4:11 CV 1626 DDN
                                 )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
          Defendant.             )
```

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Margaret O'Connor for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 13.) For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

## I. BACKGROUND

Plaintiff Margaret O'Connor filed suit on behalf of Daniel O'Connor, her deceased husband. Daniel O'Connor, who was born in 1956, filed an application for Title II benefits on April 2, 2007. (Tr. 89.) He alleged a July 24, 2006 onset date due to a broken heel, the inability to lift overhead because of shoulder weakness, a lack of balance, a swelling in his legs, frequent urination, and anxiety. (Tr. 258.) His application was denied initially, and he requested a hearing before an ALJ. (Tr. 118-28.)

On January 22, 2009, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 86-96.) The Appeals Council reversed and remanded for further administrative proceedings, including supplemental vocational expert (VE) testimony. (Tr. 97-100.) On May 18, 2010, following a second hearing, the ALJ found plaintiff was not disabled.

(Tr. 104-13.)  On August 17, 2011,[1] the Appeals Council denied plaintiff's request for review.  (Tr. 1-4.)  Thus, the May 18, 2010 decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On April 5, 2005, plaintiff[2] was seen with complaints of right shoulder pain after falling two weeks earlier.  An MRI showed fairly extensive degenerative hypertrophic or overgrowth changes at the acromioclavicular or AC joint, the joint at the top of the shoulder, resulting in impingement.  The findings were also consistent with tendinosis, a noninflammatory repetitive stress injury of tendon fibers, or a partial tear of the tendon.  (Tr. 315, 325-26.)

Plaintiff saw Dr. Robert Sciortino on April 11, 2005 with complaints of right shoulder and left arm pain.  Plaintiff's right arm had been improving but he had tripped and fallen three days earlier, landing on his left arm.  Dr. Sciortino's impression was right shoulder subacromial impingement and a partial rotator cuff tear.  Plaintiff also had a left arm fracture.  Dr. Sciortino proceeded with conservative treatment at that time.  (Tr. 316.)

On April 13, 2005, Dr. Sciortino performed a surgical nailing of plaintiff's fracture.  (Tr. 294, 301-02.)  By September 22, 2005, five months after his fracture and surgery, plaintiff was progressing.  He had been making good progress in physical therapy and was working on a home exercise program.  He still had some soreness and stiffness in his shoulder.  He reported that his right shoulder was feeling better.  His range of motion (ROM) was getting much better.  An x-ray showed the fracture was essentially healed.  Dr. Sciortino opined that plaintiff's ROM was excellent considering the severity of his fracture and that he could gradually increase his activity and return to work in a few more weeks.  (Tr. 312.)

---

[1]Daniel O'Connor died on August 27, 2010.  (Tr. 805.)

[2]This action was commenced by Daniel's surviving widow, plaintiff Margaret O'Connor, on September 20, 2011.  However, for clarity in this opinion "plaintiff" hereafter refers to decedent David.

On December 15, 2005, plaintiff saw Daniel R. Jasper, M.D., his primary care provider, who diagnosed alcoholism, history of elevated liver function tests, anxiety disorder, and history of gastric ulcer. (Tr. 367.)

Plaintiff saw Dr. Sciortino on April 13, 2006 for reevaluation of his left arm. He had been doing fairly well until a few days earlier when he fell off a ladder and landed on his left elbow and arm, causing increased pain. Dr. Sciortino's impression was a contusion or bruise of the left arm and possible mild neuropraxia or nerve injury. (Tr. 311.)

On July 24, 2006, plaintiff fractured his right heel bone while jumping from a ladder. (Tr. 494.) Plaintiff saw Gary Schmidt, M.D., on August 7, 2006. Dr. Schmidt noted a history of stasis dermatitis, an inflammatory skin condition caused by varicose veins or other circulatory conditions that causes fluid build up in the lower legs. Two weeks prior, plaintiff had fractured his right heel and had become house and bed bound. Dr. Schmidt's diagnosis was a flare up of stasis dermatitis. He ordered the fluid to be cultured for infection and started an antibiotic. (Tr. 444.) On August 8, 2006, Dr. Schmidt performed surgical repair of the right heel fracture. (Tr. 343.)

On August 21, 2006 plaintiff was seen for a staph infection of his left lower leg. The skin condition diagnosed earlier appeared healed. (Tr. 444.) Plaintiff was seen September 12, 2006 for a follow-up for his leg infection. He was diagnosed with dermatitis of the hands and feet and venous insufficiency or congestion and slowing of the circulation in his legs with ulcers. His hand dermatitis improved with medication after a week, although the soles of the feet continued to have some peeling. (Tr. 447.)

Plaintiff saw Dr. Schmidt on September 21, 2006. He opined that plaintiff was capable of performing only seated work at that time. Plaintiff saw Dr. Schmidt again on October 10, 2006. He was going to start physical therapy and was 100% weight bearing in a CAM walker boot, an orthopedic walking boot. (Tr. 509-12.)

Plaintiff was seen at Pro Rehab for physical therapy on October 13, 2006. His ROM was severely limited and significant edema or swelling was contributing to his limitations. The swelling was treated and improved

with a vasoneumatic pump.  He was given home exercises to improve ankle ROM and lower extremity strengthening.  (Tr. 458.)

Plaintiff received further treatment with the vasoneumatic pump and made significant progress in edema reduction and ankle ROM.  While deficits persisted, his progress was appropriate.  He needed further work on weight bearing, ankle ROM and strengthening, gait training, and proprioception or the awareness of posture, movement, and changes in equilibrium.  He was motivated and compliant in his participation in physical therapy.  (Tr. 466.)

Pro Rehab records dated November 3, 2006 state plaintiff reported he was able to walk his dog without increased pain after his last physical therapy session.  November 6, 2006 records state plaintiff had a 40% improvement since starting therapy but he still reported his strength and ROM were "most limiting."  By November 20, 2006, he had reached a plateau with edema reduction, and deficits persisted, but his progress was appropriate.  He continued work on weight bearing, ankle ROM and strength, gait training, and proprioception.  (Tr. 472-74.)

On November 21, 2006, Dr. Schmidt opined plaintiff was only capable of seated work and released him to sedentary duties.  (Tr. 504-05.)

Plaintiff saw dermatologist M.N. George, M.D., on December 6, 2006 for hyperpigmentation and ulceration of his lower extremities.  (Tr. 449.)

December 11, 2006 Pro Rehab records state plaintiff had made significant progress with ankle ROM and strength.  He continued to be significantly limited in proprioception of the right lower extremity, stating he frequently lost his balance in the clinic and did not seem to know where his foot was.  Plaintiff did not feel he could return to his job.  When performing standing balance activities in the clinic, he had erratic right foot placement and needed assistance with activities such as crossover stepping.  He was able to do a single leg balance for four seconds on each leg.  (Tr. 476.)

December 12, 2006 records from Dr. Schmidt state that plaintiff was not to engage in any stair climbing, pushing or pulling, or standing for more than two hours without a 15-minute break.  Plaintiff reported continued difficulty with balance and that his proprioception was "still

way off." Dr. Schmidt advised plaintiff that he wanted to have him at full duty without restriction in three weeks. (Tr. 503-04.)

Plaintiff saw Dr. Jasper on December 21, 2006. Notes describe plaintiff as a 50-year-old male with a history of alcoholism who had fractured his right heel in July 2006 and undergone surgical repair. He took Darvocet for pain and Xanax for anxiety. Plaintiff had congestion and slowing of the circulation in his lower extremities which sometimes caused ulcers. He also had elevated liver function tests. Dr. Jasper's assessment was alcoholism with a history of upper GI bleeds and alcohol-induced hepatitis, status post heel fracture, surgery per Dr. Schmidt, and mild hypertension that was stable. (Tr. 365-66.)

On January 3, 2007, after 33 visits, plaintiff was discharged from physical therapy. He continued to have difficulty with balance on his left lower extremity and lost his balance often due to continued erratic foot placement. (Tr. 478-79.)

Plaintiff saw Dr. George on January 9, 2007. He diagnosed palmar desquamation or shedding secondary to hand dermatitis and stasis dermatitis to both lower extremities with skin breakdown at the right ankle. (Tr. 450.)

Plaintiff saw Dr. Schmidt on January 9, 2007. His restrictions included no stairs, no climbing, no pushing/pulling, and standing no more than two hours without a 15-minute break. (Tr. 500.) Dr. Schmidt told plaintiff he thought plaintiff might be able to return to work, which plaintiff vehemently disputed. Dr. Schmidt decided to order a functional capacity assessment. (Tr. 501.)

Plaintiff saw Kent Adkins, M.D., for a urinary tract infection (UTI) on January 5, 2007. A CT urogram showed a tiny lesion. He saw Dr. Adkins again on January 19, 2007. His CT urogram was negative, and his PSA test was normal. (Tr. 682-87.)

On January 17, 2007, a functional capacity assessment was completed by occupational therapist Dean Schimanski. This assessment compared plaintiff's actual, tested abilities with those plaintiff stated were required by his pipefitter job. Regarding his ability to handle material, the evaluation reported that plaintiff could (a) lift 70 pounds from the floor to his waist occasionally and 35 pounds frequently; (b)

lift 40 pound from his waist to his shoulder occasionally and 25 pounds frequently; (c) lift 35 pounds overhead occasionally and 25 pounds frequently; (d) carry with both arms 60 pounds occasionally and 35 pounds frequently; (e) push 77(left)/72(right) pounds occasionally and 40 pounds frequently; and (f) pull 81(left)/65 (right) pounds occasionally and 40 pounds frequently. Regarding his non-material handling abilities, the evaluation reported that plaintiff could (a) sit with unrestricted frequency, stand frequently, walk occasionally, climb occasionally, bend with unrestricted frequency, reach with unrestricted frequency, squat frequently, and kneel or crawl occasionally. Plaintiff's main limiting factors included the following:

- Musculoskeletal deficits observed during testing include: decreases with active right ankle plantarflexion, inversion and eversion when compared to left; static strength for right ankle plantar/dorsiflexion falls 28-60% below left ankle force values. Aerobic capacity was classified as good with endurance testing, scores on the Tinetti and Berg balance tests reveal good balance on level surfaces, and no loss of balance was observed during testing. While circumferential measurements suggest the presence of residual edema in the right foot/ankle (compared to the left ankle), no increase with right ankle swelling was noted upon completion of testing.

- In comparison to the worker-reported job demands, the main factors limiting return to full duty work [as a pipefitter] at this time include his decreased heavy load handling ability, decreased climbing tolerances, decreased tolerance for frequent walking, and his subjective reports.

(Doc. 480.)

By April 23, 2007 plaintiff was improving. He reported that he still had difficulty standing or walking for more than one to two hours and that his legs got swollen after standing. Dr. Schmidt noted that plaintiff's physical therapist opined that after 33 visits he had plateaued in physical therapy and was now rehabilitated to his pre-fracture status. Dr. Schmidt opined plaintiff was at maximum improvement and that he could return to work with permanent restrictions, i.e., no standing more than than three hours without 15 minutes off his feet, and he should work on level surfaces at ground level. (Tr. 499-501.)

On May 17, 2007, plaintiff saw Robert P. Margolis, M.D., at the St. Louis Neurological Institute. Dr. Margolis opined that based on his right ankle injury and the restrictions placed on him by Dr. Schmidt, plaintiff is "totally and completely disabled from his prior employment as a pipefitter." (Tr. 745-50.)

Plaintiff saw Dr. Jasper on December 17, 2007 for a physical. His assessment was alcohol abuse, anxiety disorder that was stable, mild hypertension, a history of GI bleed secondary to gastric ulcers and alcohol abuse, benign prostatic hyperplasia or benign enlargement of the prostate (BPH), and insomnia. (Tr. 689-90.)

Plaintiff saw Dr. George on December 20, 2007 with complaints of stasis dermatitis on his lower extremities, small abrasions on the left shin, and intermittent irritation around the groin area. On January 14, 2008, plaintiff saw Dr. George for a local dermatitis flare up. (Tr. 698-99.)

A vocational rehabilitation evaluation was conducted by James England on May 9, 2008. He opined:

> If the only restrictions he had were those described by Dr. Schmidt, then I believe there would be some alternative types of entry-level service employment he could perform.
>
> Considering, however, how he actually appears to be functioning and his level of pain along with the need to elevate his legs on multiple occasions through the day and considering his personality, his anxiety and difficulty dealing with other people on a regular basis, I do not believe that he will be successful in sustaining employment in the long run.
>
> Considering his overall functional difficulties I believe he is more likely to remain totally disabled from a vocational standpoint.

(Tr. 714-723.)

Plaintiff saw Dr. Jasper on November 19, 2008 for a physical. He complained of difficulty walking and standing due to his right ankle injury. His chronic problems included venous insufficiency, benign hypertension, generalized anxiety disorder, BPH, alcohol abuse, and alcoholic hepatitis. His ankle joints had limited ROM. (Tr. 734-36.)

Plaintiff saw Dr. Adkins on January 22, 2010 and was diagnosed with BPH. (Tr. 844.)

On January 28, 2010, Dr. Jasper completed a physician statement so that plaintiff could obtain a disabled license placard. Dr. Jasper opined that plaintiff was unable to walk 50 feet without stopping to rest due to a severe and disabling condition, and that the condition was permanent. (Tr. 757.)

Plaintiff followed up with Dr. George on February 2, 2010 and was instructed to continue wearing support stockings. (Tr. 768.)

Plaintiff saw Dr. Sciortino on April 15, 2010 for a right wrist fracture. Dr. Sciortino opined the fracture would heal without surgery and placed the wrist in a splint. (Tr. 770.)

On June 9, 2010, plaintiff saw Dr. George for follow-up for his skin condition. His support stockings were readjusted, and he was instructed to elevate his legs. (Tr. 781.) Plaintiff saw Dr. Adkins on June 22, 2010 and was again diagnosed with BPH. (Tr. 753.)

On June 25, 2010, plaintiff saw Juan Carlos Escandon, M.D., for a neurological evaluation. His gait showed sensory ataxia or lack of muscle control and an unsteady stomping gait with heavy heel strikes. Dr. Escandon diagnosed a history and physical findings consistent with sensory peripheral neuropathy or damage to the nerves of the peripheral nervous system. (Tr. 793-95.) An abdominal sonogram dated June 29, 2010 showed cirrhosis of the liver. (Tr. 767.)

Plaintiff saw Dr. Escandon again on June 30, 2010 for further evaluation and testing. Plaintiff reported a history of progressive numbness and a tingling sensation in his feet with worse symptoms on the right. A nerve conduction study of the lower extremities was abnormal, consistent with sensorimotor mixed polyneuropathy, a neurological disorder that occurs when nerves throughout the body malfunction simultaneously. Dr. Escandon was uncertain as to the cause of the neuropathy but believed it could be alcoholic or of unknown cause. (Tr. 784-86.)

Plaintiff was admitted to the ICU at DePaul Health Center on August 19, 2010 for agitation and respiratory suppression. His wife had noted a change in his mental status at home. His family had returned home to

find him thrashing in his bed, very confused and combative. His blood ammonia level was elevated. Plaintiff's wife reported he had been in declining health for the past two days, with very poor appetite for 48 hours. He had quit drinking in April 2010 and had been seeing Dr. Lawrence Kuhn for depression. His diagnoses were hepatic encephalopathy,[3] acute respiratory failure, alcoholic liver disease, and cannabis abuse disorder. (Tr. 796-843.)

Plaintiff died in the hospital on August 27, 2010 from adult respiratory distress syndrome and aspiration syndrome. (Tr. 8.)

**Testimony at the Hearing**

On March 2, 2010, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 11-42.)

He and his wife live in a house with their 19-year old son. He has constant pain in both feet, although the pain in the right foot is worse. He has poor circulation in both feet. He has problems with stasis ulcers and must elevate his feet. He spends most of his time on the couch. He has limited movement of his left arm and difficulty lifting it to shoulder level. He is able to take care of his personal needs and to dress himself, including putting on his support stockings, although doing so is very difficult and takes a long time. (Tr. 17-26.)

He is anxious and takes Xanax to help him sleep at night. He is able to perform household cleaning, chores, and gardening for short periods of time. He is no longer able to pursue his former interests, including wood working, hunting, bowling, or fishing, and has lost interest in everything. His wife usually drives them in the car. He can sit for about an hour. He can lift 30 to 40 pounds but cannot lift anything over his head. (Tr. 28-35.)

Vocational Expert Jan Toshara also testified at the hearing. The VE testified that plaintiff's past relevant work (PRW) as a pipefitter

---

[3]Also called portal systemic encephalopy. Hepatic encephalopathy is associated with cirrhosis of the liver, attributed to the passage of toxic nitrogenous substances from the portal to systemic circulation; cerebral manifestation may include coma. Stedman's Medical Dictionary 636 (28th ed. 2006).

was heavy and skilled.  The ALJ posed a hypothetical question regarding an individual who was functionally limited to light work.  The individual could occasionally perform kneeling, bending, crawling, and crouching movements.  He should avoid balancing, climbing movements, as well as stairs, ramps, scaffolding, and ladders.  The individual was limited in his overhead reaching, but could do occasional pushing and pulling with his upper extremities.  He should avoid temperature extremes and wetness or humidity.  His concentration, persistence, and pace would be moderately impaired.

The VE testified that under these limitations, the individual would be unable to perform plaintiff's PRW.  The individual would be able to perform light and unskilled work, including cafeteria cashier, counter attendant, and merchandise marker.  (Tr. 38-40.)  The VE testified that if the individual's functional capacity was changed from light to sedentary, those jobs would be precluded.  She testified that if the individual needed to elevate his legs on multiple occasions, the individual would be rendered unemployable.  (Tr. 40-41.)

### III. DECISION OF THE ALJ

After considering the evidence of record, the ALJ found that plaintiff had the severe impairments of degenerative hypertrophic changes of the AC joint; status post intramedullary nailing of a fracture through the base of the left greater tuberosity; status post surgical treatment of a highly comminuted fracture through the right calcaneal tuberosity; BPH; and anxiety disorder. The ALJ found that he did not have an impairment or combination of impairments that met or medically equaled an impairment on the Commissioner's list of disabling impairments. (Tr. 104-09.)

The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light unskilled work as defined in 20 C.F.R. § 404.1567(b) which prevented him from performing his PRW.  Using VE testimony, the ALJ determined that there were jobs that existed in the national economy that plaintiff could perform.  Therefore, the ALJ concluded that plaintiff was not disabled under the Social Security Act. (Tr. 110-13.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(b)-(c), 20 C.F.R., Part 404, Subpart P, Appendix 1; Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW. 20 C.F.R. § 404.1545; Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the

Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V.  DISCUSSION

Plaintiff argues that the ALJ erred in determining his RFC and in posing his hypothetical question to the VE.

### A.  Residual Functional Capacity (RFC)

Plaintiff argues there is no medical evidence to support the ALJ's finding that he has the RFC to perform light unskilled work.  The court disagrees.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).  RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and the claimant's description of his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a).  While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional.  Lauer, 245 F.3d at 704.

In this case the ALJ found it significant that, although plaintiff sustained trauma to his left upper extremity and right lower extremity, by January 2007, less than a year after his injury, he had generally unremarkable examination findings.  (Tr. 108, 111, 747.)  The ALJ found that despite plaintiff's complaints of upper extremity impairment, examination findings showed that he could reach behind his head with either hand and had full passive ROM in both shoulders.  Despite plaintiff's complaints of disability due to his right ankle impairment, he had normal tone, power, and bulk diffusely.  He could walk on either heel and had good ROM of his foot.  (Tr. 108, 747.)  The absence of evidence to support symptoms of the severity claimed is a factor that the ALJ may consider.  See Riggins v. Apfel, 177 F.3d 689, 692-93 (8th Cir. 1999)(ALJ may properly question the credibility of claimant's allegations

of disabling pain when the medical evidence does not support the allegation).

The ALJ noted that plaintiff did not seek ongoing treatment for his right ankle injury from an acceptable medical source after January 2007. (Tr. 108.)  Plaintiff argues that he did so.  He cites record evidence from a dermatology nurse practitioner and reports of consultative examinations from before January 2007.  However, some of these visits included evaluation of his right ankle, not treatment of it. (Tr. 449-50, 466, 476, 480, 498-503, 505, 699, 714-23, 734-35, 745-50.)  These records do not demonstrate that plaintiff sought additional treatment for his right ankle after January 2007.  See Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) (ALJ may discount claimant's subjective complaints of pain based on failure to pursue regular medical treatment); Gwathney v. Chater, 104 F.3d 1043, 1044-45 (8th Cir. 1997) (failure to seek medical assistance for alleged impairments contradicts claimant's subjective complaints).

The ALJ also noted that while plaintiff claimed disability due to UTIs, he did not seek regular treatment for them and they were controlled with medication.  Plaintiff saw Dr. Adkins in January 2007 for BPH.  His tests were essentially normal. (Tr. 108, 111, 683-87.)  He saw Dr. Adkins again on April 25, 2008, for worsening urinary tract symptoms, and no adverse findings were noted. (Tr. 108, 701.)  He saw Dr. Adkins again in January 2010 and his exam was unremarkable. (Tr. 109, 753.)  The record evidence does not support a finding that plaintiff was disabled due to urinary tract problems.

The ALJ also noted that plaintiff did not pursue regular treatment for his alleged anxiety disorder. (Tr. 109, 111.)  While plaintiff was diagnosed with anxiety disorder by a nurse practitioner, her examination revealed only unremarkable mental status findings. (Tr. 109, 365-66, 689-90.)  See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in mental capabilities disfavors disability finding).  The record evidence does not support a finding that plaintiff was disabled due to an anxiety disorder.

The ALJ also noted that plaintiff's activities of daily living did not support his complaints of disability. (Tr. 111.) Plaintiff testified that although he spent most of his time on the couch, he also attended to his own personal needs, performed some light household chores and gardening, cared for a pet, and managed his finances. (Tr. 111, 249-53.) Cf. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with subjective complaints of disabling pain); Dunahoo v. Apfel, 241 F.3d at 1038-39) (eating, reading, cleaning house, making the bed, doing dishes with the help of her husband, making meals, visiting with friends, and occasionally shopping and running errands were inconsistent with claims of alleged pain).

The ALJ also provided good reasons throughout his opinion for finding that plaintiff's testimony was not entirely credible. (Tr. 106-11.) See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that when an ALJ refers to Polaski considerations and cites inconsistencies in the record, he may properly find a claimant not credible).

Plaintiff also contends the ALJ erred in his finding that he could perform light work in light of his sensory neuropathy and inability to stand for six hours per day. The court disagrees. The ALJ considered medical opinion evidence, including that of orthopedist Dr. Schmidt, who opined that plaintiff had reached maximum medical improvement by January 2007 and released him to work with the restriction that he could stand a maximum of three hours on level ground before a 15-minute break. (Tr. 108, 498). Plaintiff's need for a break after three hours of standing could be accommodated with sitting for two hours a day, an aspect of light work. See 20 C.F.R. § 404.1567(b). The ALJ also noted that plaintiff's physical therapist opined that plaintiff had achieved the same level of functioning as before his ankle injury. (Tr. 37, 107-08, 499.)

The ALJ also considered Dr. Jasper's opinion that plaintiff needed a disabled vehicle placard due to his inability to walk 50 feet without needing to rest. The ALJ noted that Dr. Jasper's opinion was inconsistent with that of Dr. Schmidt (which was limited to plaintiff's ability to work as a pipefitter) and contrary to plaintiff's generally unremarkable exam

findings.  (Tr. 11-12, 498, 747.)  The ALJ also noted that neurologist Dr. Margolis's opinion that plaintiff was disabled was inconsistent with other examination findings.  (Tr. 111, 747, 749-50.)  See Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (ALJ may discredit treating physician's opinion that is not supported by his own findings and diagnostic data).

The court concludes the ALJ properly considered the record evidence as a whole and determined that plaintiff could perform light work.  His RFC finding was supported by substantial evidence.  See Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011)

**B.   ALJ's Hypothetical Question to the Vocational Expert**

Plaintiff next argues the ALJ's hypothetical question posed to the VE failed to capture the concrete consequences of his impairment.  He asserts that the hypothetical asked about an individual capable of performing light work even though he is incapable of light work due to his neuropathy, gait disturbance, and balance problems.

The court disagrees.  As discussed above, substantial evidence supports the ALJ's finding that plaintiff could perform light work despite his foot and ankle problem.  Dr. Schmidt found that plaintiff could stand a maximum of three hours on level ground before needing a 15-minute break.  Plaintiff's physical therapist opined that plaintiff had achieved the same level of functioning as before his injury.  The ALJ further noted that plaintiff's unremarkable exam findings, failure to pursue ongoing treatment, and activities of daily living supported his RFC finding.  (Tr. 111.)

The ALJ properly propounded these limitations to the VE.  The hypothetical need only include those impairments and limitations the ALJ finds are supported by substantial evidence in the record as a whole.  See Gragg v. Astrue, 615 F.3d 932, 940-41 (8th Cir. 2010) (ALJ's hypothetical incorporated the physical, mental, and cognitive impairments that the ALJ found to be credible, and excluded impairments that were discredited or that were not supported by the evidence presented).

The ALJ asked the VE about an individual of plaintiff's age, education, work experience, and RFC, who responded that such an individual could perform the jobs of counter attendant, cafeteria cashier, and

merchandise marker. (Tr. 37-40.) Because the ALJ's hypothetical included the limitations the ALJ found which were supported by the evidence, the VE's opinion about what jobs plaintiff could perform constituted substantial evidence supporting the denial of benefits.

### VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

    /S/   David D. Noce   
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 23, 2012.